# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**FRANKIE LEE BEMBRY,**

      **Plaintiff,**

**vs.**                                                                    **4:05-CV-286-SPM**

**CITY OF TALLAHASSEE, a Florida
municipality, and OFFICER DEREK
FRIEND, individually,**

      **Defendants,**

_____/

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

**THIS CAUSE** comes before the Court upon the "City of Tallahassee's

Motion for Summary Judgment" and memorandum in support (docs. 22 and 23)

filed February 20, 2006; "Derek Friend's Motion for Summary Judgment" and

memorandum in support (docs. 24 and 25) filed February 20, 2006; the response

in opposition to both motions (doc. 29) filed March 21, 2006; and all associated

materials.  For the reasons set forth below, the Court finds the motion must be

granted.

## BACKGROUND:

Defendant Friend, a police officer with the City of Tallahassee, was

assigned to investigate a bank fraud scheme in October of 2000.  Based on

information he received from a bank teller, he obtained a warrant for Plaintiff's arrest and took him into custody.  Plaintiff alleges that after an information was filed against him, Friend discovered the existence of surveillance videotapes and fingerprints showing that Plaintiff was not the suspect who attempted to cash a stolen check on the date of the offense.  Plaintiff claims that Friend maliciously refused to disclose this exculpatory evidence and took no action to "undo" Plaintiff's arrest.  It was not until an assistant state attorney viewed the videotape and determined Plaintiff's innocence that the case against him was dismissed.

Plaintiff now sues the City of Tallahassee and Officer Friend, alleging state and federal law claims of malicious prosecution and abuse of process by Friend, and alleging deliberate indifference by the City to Friend's misconduct.  Both the City and Friend have moved for summary judgment; the City moves only as to Count IV, and Friend moves as to Counts I through III.

## SUMMARY JUDGMENT STANDARD:

Federal Rule of Civil Procedure 56(c) provides for entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the

movant has met this burden the court must view the evidence and all factual

inferences arising from it in the light most favorable to the nonmoving party.

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

The moving party may meet the burden by showing that the non-moving

party lacks evidence to support an essential element of the non-moving party's

case.  See Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996).  Once the

burden is met, summary judgment cannot be avoided by the non-moving party by

simply relying upon the allegations or denials in the pleadings.  See Walker v.

Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  Rather, to avoid summary

judgment, the non-moving party must point to evidence in the record or additional

evidence that could be "sufficient to withstand a directed verdict motion at trial."

Id. (citations omitted).  The basic inquiry by the court is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 251 (1986).


**FACTS:**[1]

The Court's synthesis of the facts results in the following timeline.

Sometime in early October of 2000, a man walked into Capital City Bank and

presented check #6776 drawn on the account of A.D.E. Automotive in the

---

[1]  The facts are presented, as they must be, in the light most favorable to Plaintiff.  Fitzpatrick v.
City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

amount of $680.  Teller Beverly Mordica cashed the check and apparently discovered later that it had been stolen from A.D.E. Automotive.  On October 12, a man walked into the same branch and presented Mordica with check #6778, drawn on A.D.E. Automotive in the amount of $685, and made payable to Frankie Bembry.  The man presented Mordica with the check and a Florida ID card (with photograph) bearing the name "Frankie Lee Bembry".  *See* doc. 29 at 1, ¶ 1.  Mordica compared the man's face with the photograph and determined they were the same person.  *See* doc. 25 at 3.  In doing so, she thought she recognized him as the man who had cashed the stolen check the previous week.  *See* doc. 1 at 2, ¶ 7.  While she attempted to alert her manager, the man walked out of the bank, leaving both the check and the ID card.  *See* doc. 1 at 2, ¶ 7.

The Tallahassee Police Department ("TPD") was called, and Officer Linda Crew responded.  *See* doc. 25 at 4.  She interviewed Mordica and impounded the check and the ID card as evidence.  *See* doc. 25 at 4.  After transferring the evidence to TPD's property/evidence room, the ID card was determined to have been lawfully issued to a Frankie Lee Bembry and had not been reported lost or stolen.  *See* doc. 25 at 4.

The case was initially given to Investigator Mike Maurer, who impounded check #6778 (the "Bembry check") and two video surveillance tapes: one from that bank and one from another branch.  *See* doc. 25 at 4.  This additional evidence was sent to TPD's property room on October 20, 2000.  *See* doc. 25 at

4.

Sometime after that date, the case was transferred to defendant Derek Friend, a TPD investigator, as he was already investigating several cases involving an organized scheme to steal blank checks from automotive businesses and cash them at local banks.  *See* doc. 25 at 5.  When Friend received the case file, there was neither a property receipt nor any notation concerning either of the two impounded videotapes.  *See* doc. 25 at 5.  Based on the information that was contained in the case file, Friend prepared a probable cause affidavit, which resulted in the issuance of a search warrant on December 29, 2000.  *See* doc. 25 at 5.  Plaintiff was arrested the following day at the Leon County jail, as he was already in custody on other charges.

Continuing his investigation, Friend went to the bank on January 8, 2001, where he interviewed Mordica and showed her a photographic lineup containing a photo of Plaintiff.  *See* doc. 25 at 6.  Mordica was unable to positively identify anyone in the lineup.  Additionally, he was told that the bank had no videotapes from the October 12, 2000 transaction.  That same day, Friend sent the Bembry check (#6778) to TPD's forensic unit for fingerprint testing, which soon thereafter reported negative results.  *See* doc. 25 at 6.

On that same day, Friend prepared and submitted an "SAO packet" to his sergeant.  The SAO packet is apparently a compilation of information gathered by TPD to be used by the State Attorney's Office in determining whether an

information should be filed.  Friend's SAO packet contained the following items:

1.  Offense Report (Ofcr. Crews) dated 10-12-2000
2.  Property Receipt (Crews) dated 10-12-2000 (impoundment of Plaintiff's check and Florida ID card)
3.  2 copies of Plaintiff's photograph
4.  Plaintiff's criminal history check
5.  E-mail dated 10-17-2000 from Phil Kiracofe concerning stolen checks
6.  Copy of both sides of the Bembry check (#6778) and ID card
7.  Sworn statement from Edward Thornton
8.  Copy of both sides of check #6776 dated 10-11-2000
9.  Contact sheet
10. Probable cause affidavit
11. Copies of arrest warrants
12. Documentation of photo lineup shown to Mordica
13. Two supplemental reports (12-13-2000 and 12-29-2000)

*See* doc. 25 at 7.  Also on January 8, Plaintiff's defense counsel served a discovery request on the SAO, which garnered no response until April 2, 2001. *See* doc. 25 at 7.  No motion to compel was filed once the SAO had missed the 15-day response deadline under Florida Rule of Criminal Procedure 3.220(b)(1), meaning that almost three months passed with no action from Plaintiff's counsel.

On January 29, 2000, SAO Criminal Investigator Jayson Tame wrote an internal memo to the assistant state attorney handling the case, advising that he had gone to the bank but was provided the wrong videotapes.  Tame stated, "Investigator Friend hopefully will be getting the correct surveillance tapes, and if I have time, I will view them with him."  Tame also noted that Friend told him about teller Mordica's inability to identify Plaintiff in the photo lineup and alerted him to the fact that Plaintiff's fingerprints were not on the check left at the bank

(#6778) the date of the offense.  *See* doc. 24, exh. Q.  A little more than a week later, on February 9, 2001, Tame wrote another internal memo, this one repeating much of what was said in the first memo (the additional information included is not relevant to this case).  *See* doc. 24, exh. R.

Proceeding without the tapes, the SAO filed an information against Plaintiff on February 12, 2001, charging him with uttering a forged instrument. *See* doc. 1 at 2, ¶ 14.  Nothing happened in the case until April 2, 2001, when the SAO responded to the discovery request.  (Plaintiff was "released" from jail on the unrelated charges March 14, 2001, but physically remained in custody on the uttering charge.)  A month and a half after the discovery response, on May 29, 2001, the SAO requested that TPD send the videotapes for viewing.  They arrived the next day, but they were not reviewed by the SAO until June 29, 2001. It was then that an assistant state attorney determined that Plaintiff was not the man in either of the tapes.  Consequently, a nolle prosequi was immediately filed, the case was dismissed, and Plaintiff was released from custody.

## ANALYSIS:

### *Malicious Prosecution vs. Abuse of Process*

Plaintiff alleges three counts under two separate theories: malicious prosecution and abuse of process.  While some courts have viewed malicious prosecution as either the unlawful initiation or continuation of a suit, it properly is concerned only with maliciously causing process to issue.  In contrast, abuse of

process is concerned with the improper use of process once it has been issued. McMurray v. U-Haul Co., Inc., 425 So. 2d 1208, 1209 (Fla. 4th DCA 1983)(*citing* 1 AM. JUR. 2D *Abuse of Process* § 2 (1962)).

The two claims serve different purposes.  While malicious prosecution is relatively self-explanatory, an abuse of process claim consists of a "willful and intentional misuse of process for some wrongful and unlawful object or collateral purpose."  Gause v. First Bank of Marianna, 457 So. 2d 582, 584 (Fla. 1st DCA 1984)(*citing* Peckins v. Kaye, 443 So. 2d 1025, 1026 (Fla. 2d DCA 1983)).  The usual abuse of process claim involves some form of extortion–-using a criminal prosecution to force payment of a civil debt.  *See*, *e.g.*, Bothmann v. Harrington, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984); 3 FLA. PL. & PR. FORMS § 21:1 (2005).

A review of the complaint reveals that Plaintiff's malicious prosecution counts combine both the initiation and continuation aspects of prosecution.  For example, Count I alleges that "Defendant Friend was directly and actively involved in the *continuation* of criminal proceedings against Plaintiff," that Defendant "lacked probable cause to *continue* criminal proceedings against Plaintiff," and that "Defendant Friend acted with malice in *continuing* criminal proceedings against Plaintiff."  *See* doc. 1 at 3, §§ 19-21 (emphasis added). Count II alleges not only that Friend "caused a criminal prosecution to be *initiated* against Plaintiff" and "acted with malice in *instituting* the prosecution," but that the

prosecution "was *continued* without probable cause."  *See* doc. 1 at 4-5, §§ 28-30 (emphasis added).

Adhering to the distinction between the two concepts, Plaintiff's two malicious prosecution counts will be discussed only as they relate to the initiation or institution of criminal proceedings against Plaintiff, while the abuse of process count will analyze the alleged continuation of those proceedings.

### Counts I and II: Malicious Prosecution Under § 1983 and Florida Law

*Qualified Immunity*

In Counts I and II, Plaintiff alleges that Officer Friend maliciously continued criminal proceedings against Plaintiff in spite of a lack of probable cause for the arrest.  Friend, as a law enforcement officer employed by the City of Tallahassee, is entitled to qualified immunity if he can show that "he was performing a 'discretionary function' at the time the alleged violation occurred."  Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004)(*quoting* Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004)).  The burden then shifts to Plaintiff to prove "(1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it."  Id. (*citing* Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman, 370 F.3d at 1264).

Discretionary function in the qualified immunity context, at least in the Eleventh Circuit, does not utilize the traditional "discretionary/ministerial"

dichotomy.  Holloman, 370 F.3d at 1255.  Instead, the court must ask whether

the actions "are of a type that f[a]ll within the employee's job responsibilities."  Id.

In making this determination, a two-prong test is used.  The court must consider

whether the government employee was "(a) performing a legitimate job-related

function (that is, pursuing a job-related goal), (b) through means that were within

his power to utilize."  Id. at 1266 (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40

F.3d 1176, 1185 n.17 (11th Cir. 1994)).  It is the "general nature" of the action

that must be examined, "temporarily putting aside that it may have been

committed [unconstitutionally]."  Id.

        In order to meet the first prong, Holloman states that "the defendant must

have been performing a function that, but for the alleged constitutional infirmity,

would have fallen with[in] his legitimate job description."  Id. (emphasis original).

In his position as a law enforcement officer with the City of Tallahassee, there is

no question that Friend's duties included obtaining and executing search

warrants, investigating cases, and referring cases to the SAO.  Indeed, he might

likely be found remiss in his duties if he did not perform these functions.

        As to the second prong, the Holloman court stated, "Each government

employee is given only a certain 'arsenal' of powers with which to accomplish her

goals."  Id. at 1267.  Pursuing those goals via means outside the "range of

discretion" is not protected by qualified immunity.  Id.  For instance, a teacher

could not enroll her students in the military to promote patriotism; neither could

she compel her students to bring their property to school and redistribute it to

demonstrate altruism.  Id.  However, a teacher may chastise a student or report

him to the principal to keep order in her classroom.  Id.

In this case, Friend was fulfilling a legitimate job-related function in

investigating the case, providing evidence to the SAO, and obtaining and

executing a search warrant.  There is no evidence that Friend engaged in any

misconduct during the course of his investigation.  He did not perjure himself on

the probable cause affidavit, Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir.1994),[2]

or arrest Plaintiff without a warrant.  Lepone-Dempsey v. Carroll County Com'rs,

159 Fed. Appx. 916 (11th Cir. 2005).

Although Plaintiff alleges malice on Friend's part, it is not present on this

record.  The available facts show that Friend was not aware that the videotapes

contained exculpatory evidence.  Once he realized during his investigation that

the fingerprints on the check did not match and that teller Mordica could not

positively identify Plaintiff in a photo lineup, he communicated this information to

the SAO.  All of the exculpatory evidence he knew about was included in the

SAO packet.  There is simply nothing on these facts which would show that

Friend performed his official duties "for an unconstitutional purpose, in an

unconstitutional manner, to an unconstitutional extent, or under constitutionally

---

[2]  The Court acknowledges Plaintiff's contention that Friend failed to include certain information on the affidavit, such as the fact that the signatures on the check and the ID card did not match.  See doc. 1 at 2, ¶ 10.

inappropriate circumstances."  Holloman, 370 F.3d at 1266.  Friend is protected

from Plaintiff's claims by qualified immunity.

### Malicious Prosecution

Even assuming a lack of qualified immunity, Plaintiff still has not made a

prima facie case of malicious prosecution.  A malicious prosecution claim under §

1983 includes the following elements: "(1) a criminal prosecution instituted or

continued by the present defendant; (2) with malice and without probable cause;

(3) that terminated in the plaintiff accused's favor; and (4) caused damage to the

plaintiff accused."  Wood v. Kesler, 323 F.3d 872, 882 (11th Cir. 2003)(citing

Uboh v. Reno, 141 F.3d 1000, 1004 (11th Cir.1998)).  These elements are

essentially the same as those required under Florida law to make out a state

claim of malicious prosecution.  E.g., Endacott v. Int'l Hospitality, Inc., 910 So. 2d

915, 920 (Fla. 3d DCA 2005); Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. 2d

DCA 2002).  Thus, both counts are analyzed under a single heading.

Defendant argues that he did not cause the continuation of Plaintiff's

prosecution and that arguable probable cause existed.  First, the decision

whether to initiate or continue a criminal prosecution lays solely within the

discretion of the Office of the State Attorney, the arm of the government

representing the public interest.  State v. Gonzalez, 695 So. 2d 1290, 1292 (Fla.

2d DCA 1997)(citing State v. Brown, 416 So. 2d 1258, 1259 (Fla. 4th DCA 1982);

Wilson v. Renfroe, 91 So. 2d 857, 859 (Fla. 1956)).  Officer Friend had no control

over whether the prosecution would be continued or dropped, and he cannot be held liable for causing the continuation of Plaintiff's prosecution.

Second, Defendant argues that Plaintiff is unable to show the existence of probable cause during any stage of the proceeding.  It is crucial to note that "*[a]rguable* probable cause, not the higher standard of *actual* probable cause, governs the qualified immunity inquiry."  Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)(citations omitted, emphasis added).  Arguable probable cause exists when "an objectively reasonable officer in the same circumstances and possessing the same knowledge as [the defendant officer] could have believed that probable cause existed . . . ."  Paullin v. City of Loxley, 2006 WL 690855, at *2 (11th Cir. Mar. 20, 2006).

In making this determination, a court must look to the information known to the officer at the time of his conduct, not facts that are known either to the plaintiff at that time or to a court later.  Jones, 174 F.3d at 1283 n.4.  Viewing the information known to Friend at the time, the Court finds that arguable probable cause existed when he arrested Plaintiff.  Friend was not involved in the original case; it was transferred to him later because of his ongoing investigation into an organized fraud scheme similar to the instant case.  When he took over the case, the evidence available to him consisted of the following:

1.    Offense Report (Ofcr. Crews) dated 10-12-2000
2.    Property Receipt (Crews) dated 10-12-2000 (impoundment of Plaintiff's check and Florida ID card)

3.      2 copies of Plaintiff's photograph

4.      Plaintiff's criminal history check

5.      E-mail dated 10-17-2000 from Phil Kiracofe concerning stolen checks

6.      Copy of check (both sides) and ID card

7.      Sworn statement from Edward Thornton

8.      Copy of both sides of check #6776 dated 10-11-2000

9.      Contact sheet

CITE.  No reference to any videotapes was found in the file.  After reviewing all evidence in the file and synthesizing the information therein, Friend prepared a probable cause affidavit for an arrest warrant.  The affidavit explained that bank teller Beverly Mordica recognized Plaintiff on the day of the offense as the same man who had cashed another stolen check the week before.  While attempting to stall him until the arrival of law enforcement, he walked out of the bank, leaving behind the check and his ID card.  Mordica was positive that he was the one pictured on the ID card, and she was certain that he was the same person who had cashed a stolen check the previous week.

Based on these facts, probable cause existed for the arrest warrant to issue.  A bank teller definitively stated that she recognized Plaintiff as the same man who had cashed another stolen check just a week before.  Additionally, instead of waiting to cash the check and complete his transaction, he suddenly walked out of the bank, leaving behind two very important items—his ID card and

the check itself, which was drawn on the same automotive account as the

previous stolen check.  This evidence comported with Friend's knowledge of an

existing organized fraud scheme in which suspects stole checks from

automotive-related businesses and cashed the checks at local bank branches in

Tallahassee.  Finally, the checks were close in number (#6776 and #6778) and

were for strikingly similar amounts ($680 and $685).  An objective officer in the

same circumstances would have believed that probable cause existed for the

issuance of an arrest warrant.

Plaintiff contends that Friend either knew or should have known about the

existence of the videotapes, which contained allegedly exculpatory evidence.

Friend's affidavit clearly states that no videotapes were included in the case file

given to him.  From the dates provided, it appears that two videos were

impounded by an Investigator Maurer on October 20, 2000.  On January 8, 2001,

Friend went to the bank to review a photo lineup with teller Mordica.  He was told

at that time that the bank had no tapes from the date of the offense.  When SAO

criminal investigator Jayson Tame eventually went to TPD to view the tapes,[3] he

realized that the bank had provided the wrong ones.  Tame wrote two internal

memos indicating this and stating, "Hopefully, Friend will have the right ones

soon."  Even without these tapes, the State believed the case to be strong

enough to pursue; on February 12, 2001, an information was filed charging

---

[3]  No mention is made of how the SAO became aware of the tapes' existence; it
was not included in the SAO packet sent by TPD to SAO.

Plaintiff with uttering a forged instrument.

It is unclear when the correct tapes were provided to the SAO.  The record reflects only that the SAO requested them from TPD on May 29, 2001.  The tapes were delivered the next day, and it was a month later that the SAO filed a *nolle prosequi* in the case.[4]  To the extent that Plaintiff claims Friend withheld exculpatory information regarding non-matching fingerprints and the teller's inability to identify Plaintiff in the photo lineup (*see* doc. 1, ¶¶ 12), that contention is refuted by the information Friend included in the SAO packet.  In addition to other materials, Friend sent reports on the fingerprint tests, documentation on the photo lineup shown to teller Mordica, and a supplemental report.  *See* doc. 25 at 7.

Once Friend submitted all the information to the SAO, it was within the sole discretion of the prosecutor as to how to proceed with the case.  As noted *supra*, even without videotapes, the State deemed the available evidence to be strong enough to support filing an information.  There is no evidence that Friend, or any other individual or entity, took any steps to "continue" the prosecution against Plaintiff.  In fact, the very same day it was conclusively determined that Plaintiff was not the individual on the videotape, a nolle prosequi was filed dismissing the charge.

---

[4]  The record also indicates that defense counsel never followed up on his/her request for discovery, filed January 8, 2001.  Had a motion to compel been filed, or some other action taken by counsel, a response might have been received before April 2, 2001.

Viewing the available evidence in the light most favorable to Plaintiff, it cannot be said that Friend either "knew or . . . should have known that the action he took . . . would violate [Plaintiff's] constitutional rights . . . , or [that] he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . . ." Wood v. Strickland, 420 U.S. 308, 322 (1975).  Summary judgment must be granted on Counts I and II.

## Count III: Abuse of Process (Florida Law)

In Count III, Plaintiff claims that "[t]he continuation of the prosecution of the Plaintiff after the officer became aware of exculpatory evidence and the unreliability and lack of trustworthiness of the initial identification was an abuse of process." *See* doc. 1 at ¶ 41.  Abuse of process involves the use of criminal or civil legal proceedings against another primarily to accomplish a purpose for which it was not designed, such as extorting payment for a debt.  Bothmann v. Harrington, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984)(*citing* Cline v. Flagler Sales Corp., 207 So. 2d 709 (Fla. 3d DCA 1968)).  In fact, the "usual" abuse of process claim involves "some form of extortion."  Bothmann, 458 So. 2d at 1169 (citations omitted).  There can be no abuse of process when it is used "to accomplish the result for which it was created, regardless of an incidental or concurrent motive of spite or ulterior purpose."  Bothmann, 458 So. 2d at 1169.

Plaintiff makes no claim that Friend used the criminal proceeding to extract payment of any sort from him.  Instead, the claim seems to be, in the

words of the <u>McMurray</u> court, "a repeat of the allegations . . . charging malicious

prosecution."  <u>McMurray</u>, 425 So. 2d at 1210.  There is no allegation of using the

criminal justice process to achieve a civil goal, such as in <u>Cline v. Flagler Sales

Corp.</u>, 207 So. 2d 709 (Fla. 3d DCA 1968).  Even in a worst-case scenario,

Friend's deliberate withholding of exculpatory evidence in order to ensure

prosecution would not constitute an abuse of process, because the withholding of

evidence would "accomplish the result for which it was created," *viz.*, continuing

the prosecution of Plaintiff.  As <u>Bothmann</u> noted, "[e]ven a pure spite motive is

not sufficient where process is used only to accomplish its intended purpose."

458 So. 2d 1169 n.8.  Thus, summary judgment must be granted on Count III.

### Count IV: City of Tallahassee

***Failure to Screen***

The only mention of a failure-to-screen claim is found in two sentences in

Plaintiff's complaint: "Defendant City of Tallahassee . . . either expressedly or

impliedly acknowledged and assented to the failure to train and/or supervise

and/or control and/or otherwise screen employees . . . for dangerous

propensities, lack of training and/or skill or other characteristics making said

officers unfit to perform their duties," and "Defendant City of Tallahassee . . .

failed to determine whether members of [TPD], including Defendant Friend,

posed a threat to the public as a result of their propensity to commit unlawful

acts."  *See* doc. 1 at 7, ¶¶ 48, 49.

The standard for deliberate indifference in the context of screening and hiring practices is found in <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397 (1997):

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.

<u>Id.</u> at 411.  The two statements in Plaintiff's complaint simply do not meet this standard.  There is no allegation that Plaintiff had a criminal background or any other indication of "propensity" to commit unlawful acts.  Assuming, *arguendo*, that Officer Friend's actions did deprive Plaintiff of a constitutional right, there is no possibility that the employer could have foreseen that such deprivation would be a "plainly obvious" consequence of hiring Friend.

**Failure to Train or Supervise**

The remainder of Count IV alleges that the City of Tallahassee failed to train, supervise, or control employees of the Tallahassee Police Department ("TPD") and ensure that its police officers did not violate constitutional and statutory rights of citizens.  The complaint alleges a general failure to screen employees for "dangerous propensities, lack of training and/or skill or other characteristics making said officers unfit to perform their duties."  *See* doc. 1 at 7, ¶ 49.  He additionally argues in his response to the motion for summary judgment that there is nothing in TPD's policies that require officers to "take steps to undo

an arrest that proves to be erroneous."  *See* doc. 29 at 10.  Plaintiff adds that

TPD's policies do not provide for disciplining an officer who "lets an innocent

person remain in jail."  *See* doc. 29 at 10.

"A failure to adequately train municipal employees constitutes an

actionable policy or custom for § 1983 purposes 'only where the failure to train

amounts to deliberate indifference to the rights of persons with whom the

[employees] come into contact.'" Cook *ex rel.* Estate of Tessier v. Sheriff of

Monroe County, 402 F.3d 1092, 1116 (11th Cir. 2005)(*quoting* City of Canton v.

Harris, 489 U.S. 378, 388 (1989)).[5]

To establish such deliberate indifference, a plaintiff must "present some

evidence that the municipality knew of a need to train and/or supervise in a

particular area and the municipality made a deliberate choice not to take any

action."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)(citations

omitted).  A showing of "simple or even heightened negligence" is insufficient.

Brown, 520 U.S. at 407.  Additionally, more than just an isolated occurrence must

be shown; a single incident of unconstitutional activity is not sufficient to impose

liability on a municipality, unless it can be shown that the incident was caused by

an existing, unconstitutional municipal policy, traceable to a municipal

policymaker.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).  Thus,

"[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a

---

[5]  Note that this is a species of "deliberate indifference" different than that used in the context of prisoner litigation.  *See* City of Canton v. Harris, 489 U.S. 378, 389 n.8 (1989).

municipality . . . can a city be liable for such a failure under § 1983."  <u>Harris</u>, 489

U.S. at 389.

  In this case, Plaintiff has presented no evidence that TPD knew of a need

to train or supervise its officers in the area of "undoing" arrests or "letting

innocent [people] remain in jail."  TPD requires that each officer successfully

complete training in several areas of law enforcement before being hired,

including probable cause and making arrests.  *See* doc. 23 at 4-5.  While

employed by TPD, officers must continue their education by attending training

courses and seminars.  *See* doc. 23 at 5.  Officer Friend has had only one citizen

inquiry and two disciplinary reports lodged against him, none of which contained

allegations similar to the instant case.  *See* doc. 23 at 7.  No allegation is made

that TPD failed to respond appropriately to these concerns.

  Assuming without deciding that Officer Friend was aware of the existence

of exculpatory evidence, his failure to take any action does not render the City

liable; it simply shows possible liability on Friend's part.  This is not a case in

which the need for training is so obvious as to render the failure to train

"deliberately indifferent."  *See, e.g.*, <u>Harris</u>, 489 U.S. at 390 n.10.  It is also not a

case in which "police . . . so often violate constitutional rights that the need for

further training must have been plainly obvious to the city policymakers, who,

nevertheless, are 'deliberately indifferent' to the need."  <u>Id.</u>  No argument is made

that "incorrect" arrests occur so often at TPD that a patently obvious need for

training in that area has arisen.

Plaintiff has not shown that the City was the "moving force" behind any alleged injury.  <u>Brown</u>, 520 U.S. at 404.  On these facts, there is no direct causal link between any municipal action and the alleged deprivation of Plaintiff's rights.  Any assumed misconduct on Friend's part is not attributable to the City.  Summary judgment must be granted as to Count IV.

**<u>CONCLUSION:</u>**

Giving Plaintiff the benefit of the doubt, Friend knew of the videotapes, but never retrieved them and never bothered to view them.  His probable cause affidavit was missing possibly exculpatory information about the signatures and the fingerprints.  His investigation was inefficient and delayed.  He failed to return phone calls to the SAO investigator.  At best, these accusations amount to a condemnation of Friend's sloppy work.  Plaintiff has not shown malice, spite, or any deliberate actions on the part of Friend, who did not know Plaintiff and would have no reason to work so hard to deprive Plaintiff of any of his rights.  Friend, as a municipal law enforcement officer, is protected by the shield of qualified immunity, which Plaintiff's complaint is unable to pierce.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.      Defendants' motions for summary judgment (docs. 22 and 24) are

hereby *granted*.

2.      The clerk shall enter summary judgment in favor of Defendants on

all counts.

3.      The motion to bifurcate trial (doc. 30) is denied as moot.

**DONE AND ORDERED** this <u>twenty-fourth</u> day of April, 2006.

_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge

/pao